# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

ANDRA "ANA" CHERI MORELAND, and )
IESHA MARIE CRESPO, )
                                   )
        Plaintiffs, )
                                   )
    v. )            Case No. 1:22-cv-03795-RJL
                                   )
1010 V, LLC d/b/a THE LIVING ROOM, et )
al. )
                                   )
        Defendants. )
                                   )

**DECLARATION OF STEPHEN CHAMBERLIN IN SUPPORT OF PLAINTIFFS'
MOTION FOR DEFAULT JUDGMENT AGAINST 1010 V, LLC**

I, STEPHEN CHAMBERLIN, hereby declares, pursuant to 28 U.S.C. § 1746, the

following under the penalties of perjury:

1. I have been a model and talent agent since 1989 I have served as Agency Director at LA Models Management, one of the world's largest and most respected talent agencies. I founded Warning Management Inc., a talent and model agency that I subsequently took public, and I am the owner and director of Rumblestorm Management, a worldwide model sourcing and management company. Rumblestorm Management acts as a professional paid scout and development platform for Models worldwide. Currently, I am associated with Premier International Model. I also worked with Michele Pommier Models as agent and scout. My key functions include quoting, negotiating, and overseeing rates, work, and career development for all talent represented by the agencies with which I've worked on a regular basis.

2. Over the past thirty-four (34) years I have represented hundreds of the world's top models. In that capacity, it has been my job to be intimately familiar with the modeling market, to quote work, negotiate deals and understand the particular factors driving the pricing for the particular work and the Models. I have quoted rates for my clients thousands of times. I am very familiar with market rates for high-end models today, because I continue to quote, negotiate and oversee rates, work and career development for my clients on a regular basis. My Curriculum Vitae is enclosed herewith as **Exhibit 1** to this Declaration.

3. The statements and opinions provided herein are based on information provided to me by counsel for the Plaintiffs in this case but are the result of my own personal experience, education, and expertise in the modelling industry

4. I have been advised, and do believe, that 1010 V, LLC ("Defendant"), the owner and operator of THE LIVING ROOM ("Living Room" or the "Club") have taken and used, without authority, certain photographic images belonging to certain highly successful and sought-after models: Andra "Ana" Cheri Moreland, and Iesha Marie Crespo, (collectively, "Plaintiffs").

5. I have also been advised, and do believe, that Defendant has failed to respond to the Plaintiffs' Complaint.

6. In connection with and in support of Plaintiffs' Motion for Default Judgment, I have been asked by Plaintiffs' counsel to evaluate and value the compensation the Models would have and should have received for the use of the Images by Living Room. Having done so, I provide my expert opinion in this Declaration as to the fair market value of Defendant's use of each Plaintiff's image in promotional,

marketing and advertising media, on websites, social media and other forum. My expert opinion as expressed in this Declaration does not include any estimation or regarding the calculations of other damages, such as special, consequential, exemplary, or punitive damages.

**A.    Information/Materials Reviewed and Methodology Employed in Formulating Expert Valuation Opinion.**

7.    In conjunction with the preparation of this Declaration, I have reviewed and examined, among other things: (a) the Complaint filed in this action along with all exhibits, including the photographic images of the Models used by Defendant, the product advertised, the usages, any alterations to the images, the media used, and the mode and scope of distribution in various markets; (b) each Model's earning history, development, growth, positioning, experience, current exposure, name recognition, personal publicity, social media profile, market demand, complimentary employment, and other factors determining and effecting earning capacity; and (c) the type and the caliber of clients that have traditionally employed each Model.

8.    Each Plaintiff Model seeks modeling jobs that will enhance her stature, protect her reputation and image and not serve as a potential deterrent for commercial brands to affiliate with that Model. In my experience and expertise, having one's image used in a way that would appear to sponsor, sanction, endorse, support or denote participation in the events the night club at issue in this case – Living Room – would damage, harm and devalue the Plaintiff's individual careers due to the nature of the industry and product advertised by Defendant. Accordingly, not one

3

of the Plaintiff Models would consider or agree to the use of their images by Defendant. My interviews with each Plaintiff in this case confirmed this assumption as each Plaintiff told me that she would not have agreed to appear in the Club ads that made the basis of this lawsuit.

9. Based on my research via the internet and a review of the images attached as exhibits to the complaint, I understand that the Club is a night club that engages in the business of selling alcohol and food to patrons in a sexually charged environment. Defendant promotes the Club events and business on websites and in social media. The use of each Plaintiff's image, likeness and identity in connection with promotional, marketing and advertisements for the Club was intended to and does necessarily imply that the Plaintiff either worked at the Club, would be in attendance at the advertised event, and/or endorsed the Club or events depicted. In the unlikely event a Model of the Plaintiff' caliber here would agree to such a job and usage, there would be negotiated a substantial premium for the work to offset anticipated and expected losses of marketability.

10. It is also my understanding via interviews with the Plaintiffs that not one of the Models was ever approached by the Club or its agent, was ever asked to authorize or approve any use whatsoever by the Club of her image, and never consented to the Club's use of her image, likeness or identity for any purpose whatsoever.

11. The rates I have established below are based on the fair market value of each Model's image for the specific appropriated use by the Club but does not calculate the damage or possible end of their career, damage to reputation, or loss of other clients and advertisers by the Models being associated with this type of business.

4

12. My opinions are based in part upon the way in which work in the modeling talent industry is priced. The rates that models are paid are based upon numerous factors, including (a) a model's desirability, based on numerous factors, including the demand for her services; (b) a model's work history, such as prior associations, appearances, endorsements, or advertisements; (c) the nature of the business seeking a model's service, the type of product, whether exclusivity is sought, the embarrassment factor from being associated with the advertisement or marketing of certain products, or similar considerations; (d) the history of the business seeking a model's services, the style, quality and production of previous advertising and promotions, and its hiring of other models and celebrities; (e) exposure, namely how broadly the Model's likeness will be circulated; (f) the type of exposure, or the "usage" of the image, such as advertising, social media, third party promotion, branding, coupon, extra usage, or corporate identity; (g) the length of exposure of usage, the period of use, and any renewals or rollovers; and (h) the nature, duration and location of the actual shoot and production.

**B.    Determination of Fair Market Value of Defendant's Unauthorized Use of Plaintiff Models' Images**

13. In estimating the actual damages for each individual Plaintiff, I employed the same approach, methodology, and process that I would typically employ when determining what to charge a company or other entity that is interested in hiring models I represent.

14. There are three primary factors a model and/or her agent will consider before consenting to a job and authorizing the use of her image: 1) the job/exposure/

association with product being advertised, and/or resulting images or tear sheets helps their career; and 2) compensation / payment. 3.) The type of work being performed and the resulting effect either positive or negative upon the course and direction of the Model's career.

15. In this case, no Plaintiff's career would have been positively impacted by appearance in the Living Room advertisements; indeed, each of their associations with Living Room could be detrimental to their commercial prospects.

16. As such, the only reason any Plaintiff would have agreed to appear in the Living Room advertisements is because she was paid enough money to do so.

17. The predominant way an authorized user could obtain images for advertising is to negotiate a contract first and arrange a photo shoot. All Usages should be negotiated prior to the actual use taking place. It is critical to note that Models do not sell pre-shot images for Advertising.

18. All advertising for specific products involve a photo shoot.

*Day Rate*

19. The basis of all negotiations in the industry is establishment of a "day rate" for work by the model. This is the base rate of compensation (determined by factors listed below) for the Model's time on the day of shoot.

20. Models do not sell images previously shot to clients to be used in their Advertising. The only legal way Defendant could obtain the images they require is to 'book' the model for a photo shoot after negotiations of rates and usages either directly with the Model or through an Agent representing the Model. A Day Rate is also the basis of compensation for a model. Time spent on set is calculated as the

Day Rate. In this case the Defendant did not engage the models in a photo shoot but misappropriated the images. The Day Rate is calculated into Fair Market Value.

21.    Chief among the factors a Model or her agent will consider in arriving at a day rate is the Model's desirability, based on numerous factors, including the demand for his or her services and relevance to product. Models and Talent spend considerable years to develop their brand (brand or image) which is often based on fitness, beauty and sexuality. Social Media followers, star rating, current press coverage, Marriage and personal relationships, current published work, TV appearances, Movie appearances and Social Media attention must be considered. The number of Social Media followers has become extremely important in consideration of a Model's bookings. Endorsements for posts on their social media platforms is directly dependent upon the number of followers and audience engagement. A client's audience and customers recognition grows with the Model's growth in Social Media numbers as does the income for the commercialization of their image. For many other factors listed there is no quantitative measure available to add or detract value to a Model's day rate but should be considered in any negotiation. Much the same as a sportsman negotiating a new contract would consider the past seasons factors such as home runs hit, touchdowns scored, sacks achieved, etc.

22.    Another factor considered is the Model's work history, such as prior associations, appearances, endorsements, and advertisements including rates established for the commercialization of their image. The Model's work history for an agent is the

basis to help establish a "day rate" to quote in negotiations for future assignments. It is important to note that past 'day rates' help establish a basis for future assignments but Models are constantly trying to raise their rates. Past rates will apply to similar product, but each new assignment's rates will depend upon the Product to be advertised and factors as listed below.

23.    A final consideration is the nature of the business seeking a Model's service, including but not limited to the type of product, service or customer experience.

*Usages*

24.    Once the Day Rate for each model has been established, the further costs to the Advertiser depends upon the "Usages".

25.    A Day Rate for each of the Usages is the basis of most negotiations in the Model Industry. It must be noted that Usages as described here are categories of use not the number of times an image is posted. In fact, once a negotiation as taken place and a contract agreed to, images produced from the photo shoot can be used in the particular Usage Categories an unlimited time in the agreed time period.

26.    I do not charge a rate for the number of times an image is posted. I quote one day rate for the method of distribution. In this case Social Media is the method of distribution of the Model's images.

27.    Advertising usage is included as the use when attaching the Advertiser's name to the Model's Image and is included in the Day Rate as paid for the model's time on set. This also allows the Advertiser to use the images produced on their business website. In other words, an Advertiser can engage the model, produce images,

8

attach their name and use on their website for One day rate total. All other Usages will be negotiated additionally.

28. "Branding" is a category of use that is included in my Fair Market Valuation and would be negotiated before a model was photographed. Models advertise product. The majority of work performed by the Models in this case have Advertised products such as Clothes, Swimwear, Lingerie, Beverages and beauty products. When the Client mentions 'product' in their descriptions or tagged language or labels or banners it is referring to the product.

29. Living Room is advertising the Models as the product and any reference to the product in these advertisements becomes a personal reference to the Model and is termed Branding. Branding ties the Model to the establishment, makes the advertisement a personal endorsement, implies that the Model will be in attendance at the club, works at the club, is available for patrons of the club or describes services that the Model would be performing at the club. Branding use is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times "Branding" language is used.

30. Coupon/ Third Party use is when a Model's mage is used to promote special deals over and beyond the original Product agreement. In the case of Alcohol Advertisement by Name Brand Alcohol these advertisements are closely monitored by the Advertising Counsel. Minimum age of 25 and other factors that can affect a Model's ability to work must be considered. Alcohol Advertising for a model is always a lucrative option for work but a certain degree of exclusivity must be adhered to. Clients do not want to see the same Model endorsing many

9

different brands and it is an agent's duty to disclose conflicts to potential Advertisers. Coupon/ThirdParty Usage is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times Coupon/ Third Party is used.

*Fair Market Value*

31.    Once a job has been negotiated (day rate plus usages the number of times used on negotiated forms of distribution, the size of the images, the number of times the image was viewed, shared or "liked" and the duration that the images remain available on a site are all factors that are outside the influence of the agent or model. The duration of exposure, time being used, would have been negotiated before initial use.

32.    Once a Model's job has been negotiated and shot the success of a campaign, the number of views, likes and distribution are the responsibility of the client. Once an image is on the web and associated with an Advertiser the number of views, the number of 'shares', the number of downloads and copies made is generally unknowable.

33.    In addition to employing the factors identified above, I reviewed the Club's use of the images of the Models, the product advertised, the usages and the distribution of the images to various markets, the number of images used and the type of each usage, all of which are set forth in detail in the Complaint, which I reviewed. I established a fair market fee for the use of each Plaintiff Model's image taking account the Model's payment history, work quality, experience, exposure and duration of career, and then multiplied each image used by the number of separate types of usage.

10

34.    Finally, in my 30 + years of negotiating contracts I have never written or encouraged a Model to sign a contract without a definition of a time usage period. A one-year contract from the date of first usage (Giving the advertiser time from the shoot to produce the advertisement until first use) for a year is the most common time period. I have seen and utilized much shorter contracts for a week, or a month or say Spring of a particular year. The one-year contract will often have terms for a rollover or extended period. Pre-negotiated rates and terms may be included but additional usages on time use are always negotiated prior to the original contract expiration.

35.    What this means is that the time use by Living Room would be considered, and an end period would be included for Image to be removed. In assessing damages, I would include a fee or rollover based on the time that the images are used. Rarely, if ever, is there a contract with Unlimited Time for use allowed. Many of the images used by Defendant may have remained on Social Media for significant periods of time, with no indication that the Defendant would have intended to remove the imagery before being contacted in this litigation. Thus, Defendant had effectively used the Models' images for an "unlimited" duration. In my experience there would be a renegotiation or rollover (repayment of original fee) at minimum every year of use.

36.    Determining the fair market value of the Defendant's use of the Plaintiffs' images necessarily requires me to attempt to recreate a negotiation process that did not occur. As such, my opinion as to the fair market value takes into consideration the factors normally considered by talent, clients and their respective agents and

11

representatives when negotiating the value of the use of the models' images to promote the clients' goods or services. I must additionally account for the value inherent in the ability of each Model to control the course and selection of business opportunities and, thus, the direction of their career which, in this case, was taken away by Defendant. These considerations are always a component of the process by which the parties to a negotiation would determine the value of the use of the Model's image, and so must be considered when establishing fair market value.

37. In this case, the Defendant circumvented the negotiation process altogether.

38. As a consequence of the Defendant bypassing all levels of negotiation with the Models, we must retroactively assess the factors that would be accounted for in the proper contractual negotiation process. This includes the status of the Models, the nature of the use and true harm to the Models in not being able to control the way in which her image was used.

39. Set forth in my estimate attached as **Exhibit 2** to this Declaration are the parameters of my expert valuation considerations and methodology for each Plaintiff Model.

40. The aggregate total in actual damages across all Models as a result of Defendant's actions is at a minimum $120,000. The range provided in my report presumes a mutual negotiation between the parties; however, in the absence of that negotiation, the actual damages collectively suffered by the Plaintiffs in this case amount to $120,000. The individual damage numbers are set forth in my attached estimate.

41.     This figure does not include any potential disgorgement of profits, punitive or

exemplary damages, attorneys' fees and/or interest.

42.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Dated: Miami, Florida
       May 13, 2024

_____
Stephen Chamberlin

# EXHIBIT 1

## I.    QUALIFICATIONS

### 1.  Narrative

I have worked as a full-time agent in the model and talent industry since 1989. As a consequence of my extensive knowledge and experience in the industry, I am frequently called upon to speak at national and international modeling conventions and have been a keynote speaker at more than 30 conventions including Model Search America, Next Top Models, the International Model and Palm Conventions.

I have served as Agency Director at LA Models Management, one of the world's largest and most respected talent agencies. I founded Warning Management Inc., a talent and model agency that was subsequently taken public. Currently I am the International Agent worldwide for Premier Models and owner and director of Rumblestorm Management, a worldwide model sourcing and management company. Rumblestorm Management acts as a professional paid scout and development platform for Models worldwide. I also worked with Michele Pommier Models as agent and scout. My key functions include quoting, negotiating, and overseeing rates, work, and career development for all talent represented by the agencies with which I've worked on a regular basis.

In my capacity as an agent, I have represented over 5,000 Models. I personally discovered, started, and developed the careers of more than 300 Models, negotiated over ten thousand contracts (including day rates and usages), and have billed personally or overseen bookings in excess of $100 million. My client associations include Conde Nast worldwide, Nordstrom, Chanel, Tom Ford, Revlon, and Tiffany's WPP Group among others.

 I have been appointed to represent internationally known models and talent to establish their crossover careers. Talent I've represented include Brooke Shields, Eva Longoria and multiple Miss Universe winners. I've also represented Claudia Schiffer, Tyra Banks, Michaela Bercu, Lauren Hutton, and Carries Otis, creating the then new concept of "SuperModels." I have identified significant market opportunities at the beginning of their careers for actors and actresses including Ali Larter, Dennis Rodman, Eric Roberts, Renee Russo, Jessica Biel, Elizabeth Berkeley, Denise Richardson, Liv Tyler, Paula Barbieri, and Julianna Margulies. I have represented Victoria Secret Angels Alessandra Ambrosio, Jasmine Tookes, and Jessica White. I served as agent for Paris Hilton and was instrumental in the development of Ms. Hilton's brand.

With over 30 years' experience as a full-time professional within the model and talent industry, I am very familiar with the current market rates for models of all standing. I am well regraded for my expertise in the area of image use, the valuation of image uses, model and public personality career valuation, and the effective rates of work

2. **<u>Professional Experience</u>**

**<u>Premier Model Management Worldwide</u>** (London Miami Los Angeles New York Paris), International Agent and Negotiation Director, August 2022 to Present

Premier Models is one of the world's top agencies and has offices and affiliates worldwide. My responsibilities is to coordinate talent movements, talent negotiations and rates between all world markets. I am in constant communication with clients, advertisers, photographers and designers to negotiate and book talent to match their needs.

**<u>Rumblestorm Management</u>**, Owner – Director, January 2009 to present

Rumblestorm Management is a worldwide sourcing and management company that operates as a paid scout and development platform for Models' working all over the world. Currently managing Models' both male and female in the US, France, Great Britain, Spain, Germany, Japan, Singapore, Italy, Australia and New Zealand.

Agencies that I am actively engaged and working for and with include but not limited to, IMG Models' Worldwide, DNA Management NY, Major Models' Worldwide, NY Models' NY, Elite NY, Ford Models' NY, Society Management NY, Women NY, LA Models' LA, M Management LA, Next Models' Worldwide, Silent Models' Paris, Premier Management London, Select Models' London and Storm Management London.

I place Models' with these and other agencies in multiple countries, book, negotiate, invoice, collect commissions, source tear sheets and monitor usage of jobs.

**<u>Michele Pommier Models</u>**, Agent / Scout, February 2016 to March 2019

Michele Pommier Models' is one of the oldest, most established and respected agencies in the United States. My involvement as an agent is to add my international experience and negotiating skills to expand bookings, secure representation of established Models' and to scout and develop new talent.

**<u>Warning Management Inc</u>**., Founder – Partner – Director, November 1998 to August 2008

A full service management company representing fashion Models', actors, commercial talent, musicians, bands, photographers, directors, brands and companies. Revenues are primarily derived from commissions paid by clients, from engagements including but not limited to, bookings, endorsements, sponsorships, commissions, residuals, exclusivities,

and royalties. The mediums worked in include but not limited to, Print, Television, Videos, Packaging, Billboards, Point of Sale, Corporate Videos, Appearances, Speaking Engagements, Film, Events, Event Management, Organization, Consultancies and Negotiations.

My responsibilities were total management and hands on involvement in every facet of the company. As director and signatory for the company, I had a complete working knowledge of every negotiation, deal and client that we represented. I was responsible for not only branding and development of the major clients but also for branding and development of the company. I built the company from one employee and zero revenue into a publicly traded company with revenues of over $30 million per annum.

**LA Model Management** (Los Angeles, CA) and **NY Model Management** (New York, NY) Agency Director, December 1991 to May 1998

LA model Management is one of the world's oldest largest and most respected agencies. I represented Models', commercial talent, actors, production services, runway, hair and make-up artists and casting services. My responsibility was the development of talent and the International marketing of the company to clients worldwide. I established the first corporate client endorsements by actors and opened a whole new industry within an industry. I developed Model Searches and TV shows that were fully sponsored and are still in production now.

**Spott Model Management** (Sydney, Australia) Agency Director, January 1989 to August 1991

Spott Models' was a boutique agency in Sydney specializing in the development of Models' for the world market. In the two years working I sent over a hundred Models' out to various agencies worldwide and represented more than two hundred international Models' on their visits to Australia.

**Association of Surfing Professionals** (ASP), Tour Representative / Sponsorship Director, December 1989 to March 1990

The Association Of Surfing Professionals is the governing body for professional surfing worldwide. I was the Pro Surfers representative on tour. I was the middle negotiator for all problems and communications between the Surfers and the Administrative body and wrote and actively sought Corporate sponsorships for both the Association and Professional Contests. I served as Contest Director on a number of International Events.

**Australian Professional Surfers Association (APSA)**, Part Time Director, December 1985 -- March 1990

> The Australian Professional Surfers Association is the local governing Association for the development of Professional Surfing in Australia and the regional representative for the World body the ASP. My responsibilities were to raise sponsorship money for a fully funded National circuit which was the satellite events that helped Australian and International surfers progress to the World Pro Tour. I organized a national program of contests and established a point system for advancement and selection to the World Tour.

### 3. Education

**1984**    Bachelor of Laws/ Economics (BEc/LLB)
University of New South Wales

**1979**    Port Macquarie High School NSW 1979

### 4. Associations

American Bar Association (ABA) Associate Member
ABA Intellectual Property Law Section Member
ABA Civil Rights and Social Justice Member
ABA Dispute Resolution Member
Member International Model Alliance
Model - Kartel International Advisory Board

## V.    PRIOR EXPERT TESTIMONY

The following is a list of all other cases in which I testified as an expert at trial or deposition:

1. *Nouveau Model and Talent Management v. Disguise Inc.*, Case No. SC111112 (Los Angeles Superior Ct.)

2. *Timed Out LLC v. 13350 Corp.*, Case No. BC583739 (Los Angeles Superior Ct.)

3. *Timed Out LLC v. Tru Hospitality Group, LLC*, Case No. BC586726 (Los Angeles Superior Ct.)

4. *Timed Out LLC v. Midway Venture LLC dba Pacer et al.*, Case No. 37-2015-002122-CU-NP-CT (San Diego Superior Ct.)

5. *Krupa et al. v. RPM Dining, Ltd.*, Case No. D-1-GN-15-003207 (Tex. 419th Jud. Dist. Ct. Travis County)

6. *Valencia et al. v. Centex Business Consultants L.C. dba The Landing Strip*, Case No. D-1-GN-15-004750 (Tex. 53rd Dist. Ct. Travis County)

7. *Edmondson et al. v. Caliente Resorts, LLC*, Case No. 8:15-cv-02672 (M.D. Fla.)

8. *Posada et al. v. Club Hospitality, Inc. et al.*, Case No. DC-15-13275 (Tex. 116th Jud. Dist. Ct. Dallas County)

9. *Banx et al. v. TMC Beverages of Dallas, Inc. et al.*, Case No. DC-16-00030 (Tex. 116th Dist. Ct. Dallas County)

10. *Lancaster et al. v. Ocala Hospitality Group, LLC dba Cowboys Saloon*, Case No. 5:16-cv-00662 (M.D. Fla.)

11. *Ruiz et al. v. La Place, Inc.*, Case No. 2:15-cv-07104 (E.D.N.Y.)

12. *Toth et al. v. 59 Murray Enterp., Inc. et al.*, Case No. 1:15-cv-08028 (S.D.N.Y.)

13. *Taylor et al. v. Trapeze Mgmt., LLC et al.*, Case No. 0:17-cv-62262 (S.D. Fla.)

14. *Timed Out, LLC v. Prisma Entm't, LLC*, Case No. BC663581 (Cal. Super. Ct. Los Angeles County)

15. *Timed Out, LLC v. Red Tie LLC*, Case No. BC664917 (Cal. Super. Ct. Los Angeles County)

16. *Canas et al. v. Flash Dancers, Inc. et al.*, Case No. 3:16-cv-00393 (M.D. Fla.)

17. *Edmondson et al. v. Velvet Lifestyles, LLC et al.*, Case No. 1:15-cv-24442 (S.D. Fla.)

18. *Gibson et al. v. Faneuil Entm't, Inc. dba Cheeta Clubs*, Case No. 50-2015-CA-0009211 (Fla. Cir. Ct. Palm Beach County)

19. *Gibson et al. v. Cowboys Saloon Gainesville, LLC et al.*, Case No. 1:18-cv-00138 (N.D. Fla.)

20. *Geiger et al. v. Creative Impact, Inc.*, Case No. 2:18-cv-01443 (D. Az.)

21. *Moreland et al. v. A-Q-B, LLC*, Case No. 6:19-cv-00372 (W.D. Tex.)

22. *Ratchford et al. v. AEG Ventures, LLC*, Case No. 1:17-cv-07368 (N.D. Ill.)

23. *Gray et al. v. Tease Lounge, Inc. et al.*, Case No. 50-2017-CA-04669 (Fla. Cir. Ct. Palm Beach County)

24. *Gibson et al. v. Resort at Paradise Lakes LLC, et al.*, Case No. 8:16-cv-00791 (M.D. Fla.)

25. *Edmondson et al. v. 2001Live, Inc.*, Case No. 8:16-cv-03243 (M.D. Fla.)

26. *Souza et al. v. Vegas Mgm't LLC*, Case No. 18-8249-CI (Fla. Cir. Ct. Pinellas County)

27. *Gibson et al. v. MRG of South Florida, Inc. et al.*, Case No. CACE15020346 (Fla. Cir. Ct. Broward County)

28. *Canas et al. v. JDJ Hospitality, Inc. dba Keys Bar & Grille et al.*, Case No. 20-CA-008346 (Fla. Cir. Ct. Lee County)

29. *Canas et al. v. Doral 7 Corp Inc.*, Case No. 1:20-cv-24214 (S.D. Fla.)

30. *Gaxiola et al. v. HKPS Bar Mgm't LLC*, Case No. 20-CA-003515 (Fla. Cir. Ct. Hillstborough County)

31. *Cerny et al. v. Deja Vu Restaurant & Lounge of PA, LLC et al.*, Case No. 5:21-cv-02914 (E.D. Pa.)

32. *Gaxiola et al. v. Cowboys Saloon Davie, LLC et al.*, Case No. CACE-16-020536 (Fla. Cir. Ct. Broward County)

33. *Sampedro et al. v. ODR Mgmt. Group LLC*, Case No. 2:18-cv-04811 (D. Az.)

34. *Pepaj et al. v. Paris Ultra Club, LLC*, Case No. 2:19-cv-01438 (D. Az.)

35. *Gibson et al. v. RPS Holdings LLC et al.*, Case No. 5:21-cv-00416 (E.D.N.C.)

36. *Krupa et al. v. Tunidor, Inc.*, Case No. 1:21-cv-20159 (S.D. Fla.)

37. *Swedberg et al. v. Goldfinger's South, Inc.*, Case No. 2020-010501-CA-01 (Fla. Cir. Ct. Miami-Dade County)

38. *Toth Gray et al. v. New Life Plastic Surgery, Corp.*, Case No. 2021-007670-CA-01 (Fla. Cir. Ct. Miami-Dade County)

39. *Ratchford et al. v. Orange Lantern, Inc. et al.*, Case No. 3:19-cv-30092 (D. Mass.)

# EXHIBIT 2

**Date:** 05/09/2024

**Club:** WASHINGTON DC THE LIVING ROOM ESTIMATE

**Fair Market Value Estimate: $120,000. per year each individual image was posted and used. Total Faair Market Value : $520,000**

| MODEL | Day Rate | # Images | Usages | Damages | Years Posted | Total Damages |
|-------|----------|----------|--------|---------|--------------|---------------|
| IESHA MARIE CRESPO | $10,000 | 1 | A, SM | $20,000 | 1 | $20,000 |
| ANA CHERI MORELAND | $50,000 | 1 | A SM | $100,000 | 5 | $500,000 |
| TOTAL | | | | $120,000 | | $520,000 |

A - Advertising,
SM - Social Media
C - Coupon
B- Branding
TP - Third Party
E - Extra
1/1 Images/ Shoot days

# IESHA MARIE CRESPO



# ANA CHERI MORELAND

